*CARRINGTON, chief justice of the general court.
The case has been so fully discussed by the judges who preceded me, that I shall not detain the court by delivering the reasons for my opinion; but shall merely observe, that I think the indictment is sufficient; that, the offences charged in it amount to arson; and that the prisoner is not entitled to the benefit of clergy.
BLAIR, one of the judges of the high court of chancery. I lay no stress upon any of the exceptions to the indictment, except that which relates to the description of Clayton’s house: which I strongly incline to think ought to have been laid as a dwelling house; for I am not satisfied with the reasoning made use of to shew that house, ex vi termini, means a dwelling house; and lord Coke’s opinion is, that the purpose to which the house is applied, ought to be stated in the indictment, as dwelling house, barn, &c. 3 Inst. 67. But it was said, that it might be called house in the indictment; and, if, upon the trial, the house proved was not one upon which arson could be committed, the judges-might direct the jury to acquit the prisoner ; and so they might, if it were not stated to have been maliciously done: but nobody will contend that the indictment would be good, without alleging the malice. Prison, however, is a dwelling house, kept by law for the abode of persons confined under legal process; and, therefore, it was sufficient to call it by that name. Which sustains the indictment, whether the other house was sufficiently described or not.
The next question is, whether the prisoner is entitled to the benefit of clergy? All that the statute of the 6 Ed. 6, intended, was to make provision for the case of particular fugitives from justice; and the word offences relates only to such offences as those fugitives should commit. Eet it be, however, that it went further, and revived the statute of the 25 Hen. 8, still arson would not be embraced, unless that of the 23 Hen. 8, was revived also. Which, at most, can only be done by implication; and, to that species of argument, I *can never assent in a criminal case. The inference drawn from the statute of the 4 and 5 Ph. & M., stands upon no better footing ; for an express parliamentary declaration that it had been revived, contrary to the fact, ought not to be regarded ; and much less a constructive one. Nor is the argument, that the statutes were a system of laws, of more weight; for that supposes them all to be in existence, which was the thing to be proved. Therefore, if it were a new case, I should be at no loss to decide in favour of the prisoner. But the decision’ in Powlter’s case, has pervailed so long, that it must be submitted to; and the authority of it, for the reasons mentioned by judge Byons, cannot now be shaken. The consequence is, that the benefit of clergy must be denied.
WYTHE, one of the judges of the high court of chancery — Dissented from the majority of the court upon the point of clergy ; but said it would be tedious and unnecessary to state his reasons for it.
PENDLETON, President,
as well of the high court of chancery as of the court of appeals. The indictment is an indictment at common law ; and none of the exceptions to it are of any weight, except the first; which consists of two branches, namely, that the house is not stated to be the property of Clayton; and that it is not called his dwelling house. The first is entirely groundless; for the words, “house of William Cla3rton,” mean that it belongs to him: and the second is not much better founded. Dwelling house is a complex *674 term, and scarcely more certain than house; for it is not confined to any particular room in the building, nor even to the same room, but it extends to all the houses- belonging to the curtilage; and therefore the difficulty is as great under one description as the other. But do the authorities require that it should be called a dwelling house? The Mirror is not very precise upon the subject ; and lord Coke is rendered equally obscure by the addition of his Videlicet; which leaves it not very clear, whether he was describing the offence itself, or the form of the indictment. Hale and Hawkins, however, both drop the word dwelling, using house only; and that practice is followed in the Crown Circuit Companion, without ever having been'questioned ; which puts an end to the difficulty as to the house of Clayton. And the description of the prison is clearer still; for that word, ex vi termini, imports a dwelling house; because it is the abode of the unfortunate men confined there; and the burning it, over their heads, is the more aggravated offence of the two, as confinement is no part of the punishment, but is intended to prevent their escape from justice ; and they ought not to receive less protection, when in the custody of the law, than if they were in their own houses. I think, therefore, that the general description of house, is sufficient; especially as it is the duty of the judges, upon the trial of the cause, to instruct the jury what kind of house should be proved; and, if that burnt is not one, upon which arson can be committed, to direct them to acquit the prisoner.
The point, relative to the benefit of clergy, was determined two hundred years ago; and appears, to me, ’ to have been properly decided. A short review of the statutes upon the ■ subject will prove this. That of the 23 Hen. 8, took clergy from those only, who -were convicted by verdict; but the 25 Hen. 8, extended it to outlaws, mutes and fugitives. This, however, was altered, probably through mistake, by statute 1 Ed. 6; -which restored clergy to arspn: but the latter was, in effect, repealed, and the 23 and 25 Hen. 8, revived by the 5 and 6 Ed. 6: which, reciting the 25 Hen. 8 and 1 Ed. 6, and taking notice of a particular kind of fugitives, adds that “all and every article, clause and sentence, contained in the same, touching clergy, shall, touching such offence, stand in full strength and virtue.” The words, touching such offenders, in the preceding member of the sentence, related to the fugitives.; but the words, such offences, in this, must have relation to the offences generally ^’enumerated, in the recital contained in the statute; and takes clergy from them, as being within the same mischief. This construction gives full effect to all the words in the statute; but, without it, the words, “article, clause and sentence,” would be superfluous. The parliamentary construction in the 4 and 5 Ph. & M., is agreeable to that view of the subject; and strengthens the precedent of Powtler’s case: which I am unwilling to disturb for the reasons given by judge Eyons. So far from it, that, if I had any | doubts upon the construction myself, I should, most cordially, unite with the judges who consider themselves bound by that decision.
I am therefore of opinion, that the exceptions to the indictment are groundless; and that the law is, that benefit of clergy is taken from the prisoner.
The certificate to the general court was, that the errors filed in arrest of judgment were insufficient; and that the prisoner was not entitled to the benefit of clergy.
Note. No cause decided, since the revolution, is more important than this, as it fixes, by the opinion of a large majority of the judges, distinguished for their patriotism, independence and ability, a principle necessary for the tranquility of society, and the safety of the general transactions of mankind, namely, that a settled construction of a statute, forms a precedent, which should be adhered to as part of the law itself; and ought, upon no criticism of words, to be departed from. Accordingly, the decisions of the court, since that period, abound with instances of the same kind; but none of them state the ground and reason of it, with so much ijorce, as the following remarks of ex-president Madison; which are so lucid and convincing, that the reporter hopes he will be excused for inserting them here:
“The charge of inconsistency between my objection to the constitutionality of such a bank in 1791, and my assent in 1817, turns on the question, how farlegisla-tive precedents, ^expounding the constitution, ought to guide succeeding legislatures, and to overrule individual opinions.
“Some obscurity has been thrown over the question, by confounding it with the respect due from one legislature to laws passed by preceding legislatures. But the two cases are essentially different. A constitution being derived from a superior au- . thority, is to be expounded and obeyed, not controlled or varied by the subordinate authority, of a legislature. A law, on the other hand, resting on no higher authority than that possessed by every successive legislature, its expediency, as well as its meaning, is within the scope of the latter.
1 ‘The case in question has its true analogy in the obligation arising from judicial expositions of the law on succeeding judges; the constitution being a law to the legislator, as the law is a rule of decision to the judge.
“And why are judicial precedents, when formed on due discussion and consideration, and deliberately sanctioned by reviews and repetitions, regarded as of binding influence, or rather of authoritative force, in settling the meaning of a law? It must be answered; 1st, because it is a reasonably and established axiom, that the good of society requires that the rules of conduct of its members should be certain and known, which would not be the case if any judge, disregarding the decisions of his predecessors, should vary the rule of law according to his individual interpretation of it. Misera est servitus, ubi jus est aut vagum aut incognitum. 2d, because an exposition of the law publicly made, and *675 repeatedly confirmed by the constituted authority, carries with it, by fair inference, the sanction of those who, having made the law through their legislative organ, appear under such circumstances to have determined its meaning through their judiciary organ.
“Can it be of less consequence that the meaning of a constitution should be fixed and known, than that the meaning of a law should be so? Can indeed a law be fixed in its meaning and operation, unless the constitution be so? *On the contrary, if a particular legislature, differing in the construction of the constitution, from a series of preceding constructions, proceed to act on that difference, they not only introduce uncertainty and instability in the constitution, but in the laws themselves; inasmuch as all laws preceding the new construction, and inconsistent with it, are not only annulled for the future, but virtually pronounced nullities from the beginning.
“But it is said that the legislator having sworn to support the constitution, must support it in his own construction of it, however different from that put on it by his predecessors, or whatever be the consequences of the construction. And is not the judge under the same oath to support the law? yet has it ever been supposed that he was required, or at liberty to disregard all precedents, however solemnly repeated and regularly observed; and by giving effect to his own abstract and individual opinions, to disturb the established course of practice in the business of the community? Has the wisest and most conscientious judge ever scrupled to acquiesce in decisions in which he has been overruled by the matured opinions of a majority of his colleagues; and subsequently to conform himself thereto, as to authoritative expositions of the law? And is it not reasonable that the same view of the official oath should be taken by a legislator, acting under the constitution, which is his guide, as is taken by a judge, acting under the law, which is his?
“There is in fact and in common understanding, a necessity of regarding a course of practice, as above characterized, in the light of a legal rule of interpreting a law: and there is a like necessit3r of considering it a constitutional rule of interpreting a constitution.
“That there may be extraordinary and peculiar circumstances controlling the rule in both cases, may be admitted; but with such exceptions, the rule will force itself on the practical judgment of the most ardent theorist. He will find it impossible to adhere to, and to act officially upon, *his solitary opinions as to the meaning of the law or constitution, in opposition to a construction reduced to practice, during a reasonable period of time; more especially where no prospect existed of a change of construction by the public or its agents. And if a reasonable period of time, marked with the usual sanctions, would not bar the individual prerogative, there could be no limitation to its exercise, although the danger of error must increase with the increasing oblivion of explanatory circumstances, and with the continual changes in the import of words and phrases. ’ ’
[better of Mr. Madison to C. J. Ingersoll, June 25, 1881.1